IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JAY NOLAN RENOBATO | § | |
| PO BOX 9771 | § | |
| THE WOODLANDS, TX. 77387 | § | CIVIL ACTION  No. _____ |
| PLAINTIFF | § | |
| v. | § | |
| | § | ►JURY TRIAL DEMANDED◄ |
| BUREAU OF THE FISCAL SERVICE | § | FED.R.CIV.P. 38 |
| f.k.a. BUREAU OF THE PUBLIC DEBT | § | |
| 401 14th STREET SW | § | |
| WASHINGTON, DC. 20227 | § | |
| DEFENDANT | § | |

United States Courts
Southern District of Texas
FILED

DEC 2 8 2017

David J. Bradley, Clerk of Court

**PLAINTIFF'S ORIGINAL COMPLAINT, AND
STATEMENT OF CLAIM**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW ONE Jay Nolan Renobato (hereafter "Plaintiff," "Claimant," "Renobato,"

or "*JNR*") appearing *pro se*, to enter, file, and docket the instant civil lawsuit against

Bureau of the Fiscal Service[1] f.k.a. Bureau of the Public Debt (hereafter "Defendant,"

"Respondent," "Bureau," or "BFS/BPD") in the United States District Court for the

Southern District of Texas pursuant to federal antitrust laws, and also Money and Finance

regulations compiled in United States Code and Code of Federal Regulations hereby

commencing this civil action for due affirmative relief in the form of money damages

---

[1.] Reportedly Bureau of the Fiscal Service is a "new Bureau of the Treasury Department formed from the consolidation of the Financial Management Service and the Bureau of the Public Debt" that started on October 7, 2012. (*See* fiscal.treasury.gov) Its purported "mission is to promote the financial integrity and the operational efficiency of the U.S. government through exceptional accounting, financing, collections, payments, and shared services." (*Id.*) Formerly, Bureau of the Public Debt financed government operations, accounted for the resulting public debt, and provided financial and administrative services to federal agencies, whereas Financial Management Service supplied central payments, collections, and deposit services for the federal government and prepared the financial statement for the federal government. (*Id.*) By combining these responsibilities BFS proclaims it transforms the way the federal government manages its financial services. Admittedly, Bureau of the Fiscal Service "borrows the money needed to operate the federal government through the sale of Treasury bills, bonds and notes and accounts for the resulting debt." (*See* EXHIBITS- A1, A2, & A3 *attached hereto, and see also* FED.R.CIV.P. Rule 36(b))

and/or equitable remedies, and to demonstrate and prove by the preponderance of the evidence certain material economic terms as outlined in the following numbered paragraphs. (FED.R.CIV.P. Rules 3, 8(a), 10) Ultimately at stake in the instant controversy is the very essence of the American way in an economic system of unbridled capitalism in terms of perfecting competition and checking the integrity and efficiency in operation of free trade and open market participation for all players in the money supply chain, plus the commercial honor of the full faith and credit of the United States backing Treasury Bill products or by-products as sold, issued, distributed and settled by Respondent Bureau. (*See e.g. United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465 (1919), *Reeves Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271 (1980), accord *Official Airlines Guide Inc. v. FTC*, 630 F.2d. 920 (2nd Cir. 1980), cert. denied, 450 U.S. 917, 101 S.Ct. 1362 (1981))

## INTRODUCTION

**1. Jurisdiction and Venue.** Jurisdiction is proper here, over both the persons and the property, and rests on federal question, diversity, and amount in controversy basis. (28 U.S.C. Ch. 85) Venue in the Southern District of Texas is also proper because Harris County Texas is the *situs* of where the action arose, where Plaintiff's sole proprietorship was started and conducts its arbitrage investment business, where the commercial transactions took place, and as prosecutorial convenience requires. (*See* 28 U.S.C. § 1391, *and see e.g. Smith v. Lummus*, 149 Fla. 660, 6 So.2d 625)

**2. Federal Question.** This civil case is primarily brought and arises under United States Code and Code of Federal Regulations and culminates in Sherman Act and Clayton Act (a.k.a. federal Antitrust law) charges against Bureau of the Fiscal Service according to Chapter 1 of Title 15 Commerce and Trade, but begins with directly applicable statutes

codified in Chapter 31 Public Debt of Title 31 Money and Finance, and the remaining

rules and Regulations Relating to Money and Finance promulgated under Title 31 Code

of Federal Regulations, in addition to compulsory actions under Chapter 1 Commodity

Exchange Act[2] of Title 7 Agriculture. (*See* 7 U.S.C. Ch. 1; 15 U.S.C. Ch. 1; 17 C.F.R. *et*

*seq.*; 31 U.S.C. Ch. 31; 31 C.F.R. Subtitle B; 31 C.F.R. §§ 357.10-12, 357.13; 28 U.S.C.

§§ 1331, 1337 1361; U.S. CONST. art. III, § 2, *see also e.g. Exxon Shipping Co. v. Baker*,

554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), *and Palmore v. United States*,

411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973)) More expressly however, Title 15

United States Code stipulates that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws may sue therefore in any

district court of the United States." (15 U.S.C. § 15)

**3. Diversity of Citizenship.** The above captioned case is between citizens of different

States and names (i.e. identifies) the proper parties thereto. (28 U.S.C. § 1332) Plaintiff

Renobato is an arbitrageur by trade and natural person domiciled and maintaining a

business address at PO Box 9771 in The Woodlands, Texas 77387; whereas Defendant

Bureau of the Fiscal Service is a government agency and artificial person with

headquarters located at 401 14th Street SW in Washington D.C. 20227; and back office

---

[2.] Individual and property rights granted in the U.S. Constitution also govern. (U.S. CONST.) However, neither Securities Act of 1933, nor Securities Exchange Act of 1934 are used as primary governing law because the definition of "security" legislated thereunder doesn't cover "any security issued or guaranteed by the United States" government, and specifically excludes "currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months" from what constitutes a security. (*See* 15 U.S.C. §§ 77c(a), 78c(10) 78c(42), *and Sinva v. Merrill Lynch Pierce Fenner & Smith Inc.*, (SDNY1966), FED.SEC.L.REP. 1966-1967 CCH Dec. ¶91,870) The T-bills at issue in this case have a three month maturity. (Record.) Throughout the text of this document; the terms bills, notes, and bonds are generally speaking collectively referred to as "government securities," and from time to time may be called "Freedom Shares," or "Zeros" (e.g. Treasury Investors Growth Receipt ('TIGR'), or Certificate of Accrual on Treasury Securities ('CATS'). (*See* 31 C.F.R. Part 321, *and see e.g.* FINRA Complaint Form 4530: Product Code 3) Also, Title 17 Code of Federal Regulations labeled Commodity and Securities Exchanges applies directly or indirectly, and is referred to periodically herein. (17 C.F.R.)

Sub.Mat.//: Renobato v. BFS/BPD
CATS.//: Money & Finance, Commerce & Trade
i r a c

© *JNR*
2017

operations at 200 Third Street in Parkersburg, West Virginia 26106 and in other States.

**a. Plaintiff.** Texas resident Renobato is registered owner (i.e. entitlement holder) of the relevant *TREASURY DIRECT*® Account and is also owner of the personal property (i.e. 90-day T-bills) at issue in this case. (Record.) Plaintiff's standing to bring suit is founded on certain property ownership, account, and transactional facts described herein. (*See infra.*) Prosecution claims Defendant encroached on Renobato's securities entitlement rights (i.e. denominational exchange options) on 90-day T-bills beneficially owned over the course of fiscal years 2016 and 2017 as identified, accounted for, and evidenced hereinafter. (*See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806))

**b. Defendant.** The Washington D.C. Bureau of the Fiscal Service is definitively the proper party to be charged with "transactions after issue," whereas the U.S. Treasury and Federal Reserve are not proper parties. (*See* 31 C.F.R. § 306.1(b), *but compare* 31 C.F.R. § 357.23) At the same time, Bureau of the Fiscal Service is statutorily amenable to law for its violations, omissions, or failures to follow the underwriting terms of the 90-day T-bill offering circulars (31 C.F.R. § 321.15), for accepting tenders (i.e. "bid") and processing transaction requests (i.e. "ask") (31 C.F.R. § 356.11), and also for its performance in entering autocharge delivery and payment routing instructions relating to government securities. (31 C.F.R. Part 356; FED.R.CIV.P. Rule 17(b)) More, prosecution asserts that Respondent acted intentionally at all times relevant hereto, that is to say; knowingly, purposely, recklessly, or negligently with regards to its capital market duties of ensuring appropriate T-bill dividend distributions are made. (FED.R.CIV.P. Rule 17)

**4. Amount in Controversy.** The amount of actual damages accounted for in this lawsuit is well in excess of the $75,000 threshold amount, exclusive of interest and costs. (28

U.S.C. §§ 1332(a), 1337) Furthermore, legal relief is afforded for lost, stolen, destroyed, mutilated, and/or defaced obligations as are identified and numbered (i.e. serialized) herein. (*See* 31 U.S.C. § 3125, *and LeBlanc v. Spector*, 378 F.Supp. 301 (D.Conn.1973))

**5. Venue.** As convenience dictates, the federal district court for the Southern District of Texas has sufficient authority over the subject matter and the parties to legally adjudicate the controversy because the SDoT is at the nexus of where Plaintiff's company is found, where all of the government securities were purchased, and where a substantial part of the interactions between the public customer investor and fiscal service agency giving rise to the complaint occurred *de facto*. (28 U.S.C. §§ 124(b), 1391; 31 C.F.R. § 306.100)

## BACKGROUND

**6. *Bona fide* arbitrage *STRIPS TRADES*.** The pervasive commercial subject woven throughout the bulk of this case is Plaintiff's lawful exercise of securities entitlements and use of denominational exchange provisions in current Treasury laws pertaining to money and finance regulations in the contractual "purchase" and "sale" of government obligations in interstate commerce netting capital gains (i.e. [lost] profits) sought to be secured and/or recovered by this action brought principally for money damages.[3] (R.) Briefly over the past two (2) years Plaintiff, whose repurchase instructions on Form 3905 were failed to be followed by Defendant causing economic injury, bought and sold twenty-three (23) 90-day Treasury bills [Series 912796] in cash forward trades generating

---

[3] Most repurchase agreements (i.e. a sale and forward repurchase of a security, or a secured financing) are documented by a writing such as a Master Repurchase Agreement as published by the Public Securities Association ('PSA'). (PSA- 40 Broad Street, New York, NY. 10004) With regard to the characterization of a repurchase transaction, the PSA Master Repurchase Agreement provides that: (1) the parties intend that all repurchase transactions under the agreement be "sales" and "purchases," and not "loans," and (2) in the event any such transactions are deemed to be "loans," the seller (a) shall be deemed to have pledged to the buyer as security for the performance by the seller of its obligations under each repurchase transaction, and (b) shall be deemed to have granted the buyer a security interest in, all of the securities purchased pursuant to the repurchase transactions between buyer and the seller under the agreement and all proceeds thereof.

millions of dollars in gross revenue on paper for the arbitrage business of such beneficial owner, and simultaneously producing millions of dollars in mint seignorage to the benefit of the Department of the Treasury and/or any number of its subsidiary entities (i.e. BFS, BPD, BEP, US Mint, Fed, IRS, etc.). A detailed itemized listing of the transactional facts are contained at the end of this pleading as EXHIBITS reflecting fiscal years 2016 and 2017 respectively. It should be denoted that strictly speaking, the securities industry trade secret notions of: securities haircuts, sales against the warrant box, and participant hypotheticals- for purposes of simplicity under Federal Rules of Civil Procedure Rule 8(e)(1), will not be cited in this or later writing of prosecution, or unless requested to do so by the Court. (12 C.F.R. § 220.6(b); 17 C.F.R. §§ 240.15c3-1, 402.2; 31 C.F.R. Part 357 App. B(*J.*); Federal Reserve Regulatory Service ("FRRS") Reg T (Rulings and Opinions) Transmittal 184 (6/96) "SHORT SALES: Against the Box; Warrant Box;")

## LEGAL DESCRIPTION OF PROPERTY

**7. 90-day [13-Week] Treasury bills.** Treasury bills are bearer obligations of the United States promising to pay a specified amount on a specified date, and are payable at maturity upon presentation to Bureau of the Fiscal Service. (31 C.F.R. § 309.2) The Secretary of the Treasury issues certificates of indebtedness of the Government and/or Treasury bills of the Government for amounts borrowed on the full faith and credit of the United States.[4] (31 U.S.C. § 3104(a)) Treasury securities are made available for public subscription in the open market as offered, sold, issued, and/or distributed by Bureau of the Fiscal Service. (31 C.F.R. § 306.1(a); 12 U.S.C. §§ 263, 283) Moreover, the Secretary

---

[4.] Article 1 Section 8 of the U.S. Constitution empowers the government to borrow money on the full faith and credit of the United States, and to pay its debts, whereas the 14th Amendment declares the public debt shall not be questioned. (U.S. CONST. art. I, § 8, amend. XIV, § 4) The power of the government to coin (i.e. manufacture/print) money is embedded in U.S. law. (U.S. CONST. art. I, § 8[5]; 31 U.S.C. Ch.51)

through the Code of Federal Regulations prescribes conditions for issuing such certificates or bills and the conditions under which the certificates or bills may be redeemed before maturity. (31 U.S.C. § 3104(b); 31 C.F.R. Parts 306, 309) Treasury bills are issued in various thousand dollar amounts including denominations of $1,000, $10,000, $15,000, $50,000, $100,000, $500,000, and $1,000,000; whereas statutorily **"exchanges from higher to lower and lower to higher denominations of the same series will be permitted at the Bureau of the Fiscal Service."** (31 C.F.R. § 309.3) In issuing such obligations under Title 31 United States Code- Money and Finance, the terms for issuance, public offering and/or subscription, prices, principal and interest rates, payment dates, as well as form and denomination of the obligations is set or fixed according to Title 31 Code of Federal Regulation sections. (31 U.S.C. §§ 3121, 3123; 31 C.F.R. *et seq.*) More particularly, within the *STRIPS TRADES* programs of the Department, 90-day T-bills are composed of two elements, namely; (1) an "interest only" ('IO') coupon or *tint* , and (2) a "principal only" ('PO') bill or *corpus*, representing the interest bearing and discount bases upon which original issue T-bills are offered or sold. (31 C.F.R. § 309.1) The Separate Trading of Registered Interest and Principal Securities (*'STRIPS'*) *tint* component is stripped from and paid at issuance of the zero coupon bill, and upon maturity of the 90-day term the principal only *corpus* is paid via electronic credits or by physical dollar bills[5] as routed through the Treasury Reserve Automated Debt Entry System ('*TRADES*'). (31 C.F.R. §§ 356.2, 357.0) The identified personal

---

[5] The obvious difference between the appropriateness of using mere electronic bank credits versus actual underlying physical dollar bill assets in delivery and settlement of the referenced transactions is whether the *TRADES* are defined as a "forward" or "futures." (*See e.g. In the Matter of The Siegel Trading Company* (CFTC 1984), COMM.FUT.L.REP. 1986-1987 CCH Dec. ¶22,905 (citing *United States v. Winograd*, (CA 71981), COMM.FUT.L.REP. 1980-1982 CCH Dec. ¶21,234) This case does not take up the issue of whether or not Claimant had opportunity to trade the T-bills stripped IO components, however such *tint* refund payments are accounted for, and itemized in an EXHIBIT to this pleading. (*See* EXHIBITS- L1 & L2 *below.*)

property, *res*, or subject matter on which this case is couched are notes, bills, or bonds manufactured inside the Department of the Treasury but are sold, issued, and distributed by BFS, however Renobato is the registered owner and creditor on such financial instruments and subscribes to such capital stock by affirmative regulations in the public interest. (7 U.S.C. § 5; 12 U.S.C. § 283) Note, the overlying option (i.e. securities haircut/ marginal cost) required on a securities position held or carried for a dealer trading for his own account is $1,000, whereas the corresponding standardized contract size for 90-day Treasury bill instruments is $1,000,000, realizing also the cost of the fungible underlying physical asset (i.e. dollar bills [regardless of denomination]) is 0.04¢ per unit. (*See* EXHIBITS- B & C *attached hereto*.) In sum, Claimant's reverse repurchase agreements formed as sales against the warrant box (i.e. writing covered calls) in cash forward ***bona fide*** arbitrage T-bill *STRIPS TRADES* in interstate commerce that Bureau is attempting to monopolize by fixing prices and its concerted refusal to deal are redressed by damage adjustments in bill valuation of this case. (*See* 17 C.F.R. §§ 240. 15c3-1, 16e-1, 402.2; 12 C.F.R. § 220.6(b); *In re Riggle's Will*, 11 A.D.2d 51, 205 N.Y.S.2d 19; *and* EXHIBIT- D.)

## STATEMENT OF CLAIM

**8. Case (U.S. CONST. Amend XIV Sec. 1, Amend IV).** This part commences the formation of an <u>adverse claim</u> against Bureau of the Fiscal Service that Renobato has a demonstrable property ownership interest in 90-day T-bill "securities"[sic], and that it is a violation of the rights of Claimant for Defendant to withhold exchange, or to deal with Form 3905 (i.e. "free-riding" NASD Manual- Rule IM-2110-1, FINRA Complaint Form 4530: Problem Code: 00). (31 C.F.R. §§ 306.10, 357.2) Accordingly, prosecution hereby affirmatively avers and will prove in the course of this proceeding that Defendant

intentionally perpetrated technical acts of conversion (i.e. the exercise of dominion and control over the property, but not to convert the property), trespass to chattel (i.e. intermeddling in personal property of another), refusals to deal (i.e. passive market making), and false pretenses (i.e. that seriously interfered with ability of owner to control the property thereby causing damages to Plaintiff) all as illegal state action. (FED.R. CIV.P. Rule 8(a)) Claimant, in support thereof, now begins to introduce relevant evidence in establishing certain factual matters that are requested to be admitted without question.

**9. Account (31 C.F.R. § 357.20).** Primarily, the most key fact here is that Jay Nolan Renobato is the registered individual account owner of *TREASURY DIRECT*® Account number R-192-092-757. (*See* 31 C.F.R. § 357.21, *and see* EXHIBIT- E *incorporated herein.*) The registration of said natural person on the "ManageDirect » Registration List" title records of the Treasury as JNRenobato (***-**-1412) in his own right, is actual conclusive ownership of the Treasury bills by law, and does not include any restriction whatsoever of owner **JNR** to dispose of the securities "in any manner" [emphasis added]. (31 C.F.R. §§ 306.10, 306.11(a)(1)) As such, this fundamental truth yields firm ground on which to form, maintain, and carry forward legal claims made herein against Bureau.

**10. Debt (31 U.S.C. § 3104, 31 C.F.R. § 309.2, 12 U.S.C. § 221).** More commonly referred to as *indebitatus assumpsit*, *TREASURY DIRECT*® Account owner / entitlement holder Renobato claims that such 90-day T-bills held of record by Claimant are ineed certificates of indebtedness or obligations flowing from Treasury Reserve Automated Debt Entry Systems, payable by or through Bureau of the Fiscal Service Division of Customer Service who is the entity responsible for entering appropriate price data concerning the "purchases" and "sales" of the TIGRs. (*See* 31 U.S.C. § 3104, 12 U.S.C. §

221, 31 C.F.R. Part 357, *and see also* Note 2 *above*.) Applicable 90-day T-bill issues in this case appurtenant to the adverse claim of debt owed by Respondent to Claimant are segregated by fiscal year, are further identified by the following serial (i.e. *CUSIP*) numbers; and were to be safe-kept by BFS. (*See Interstate Comm. Com'n v. Brimson*, 145 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047, *and Dukes v. Rogers*, 67 Ga.App. 661, 21 S.E.2d 295)

### 2016[6]
912796HK8, 912796GH6, 912796GN3, 912796GS2, 912796GW3,
912796JG5, 912796JL4, 912796JQ3, 912796JU4, 912796HU6,
912796KA6, 912796KD0, 912796KG3, 912796JE0, *and* 912796KP3

### 2017[6]
912796KQ1, 912796KU2, 912796LA5, 912796LF4, 912796LL1,
912796LQ0, 912796LU1, *and* 912796LY3

These derivative freedom shares were lawfully purchased or acquired by Plaintiff at government auctions that are conducted every Monday as administered by Bureau of the Fiscal Service through its *TREASURY DIRECT*® website. (31 C.F.R. §§ 306.1(a) 309.1, 357.0) Renobato's cash forward stop loss orders maximizing profits in the future spot market for the CATS are listed in Treasury claim Form 1025, and customary ("IRS") Schedule D Capital Gains Form 8949 formats. (*See* 26 U.S.C. § 1201, EXHIBITS- K1 & K2 *attached hereto, Commissioner of Internal Revenue v. Rowan Drilling Co.*, C.C.A.Tex., 130 F.2d 62, *and Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996))

**11. Form 3905 Use (31 C.F.R. §§ 306.1(b), 306.15(a)).** Pursuant to current regulations Bureau of the Fiscal Service is legally responsible for executing certain "fiscal services"[7] and/or "transactions after issue," such as transaction requests, transfers, denominational exchanges, and reissues of U.S. Securities. (31 U.S.C. § 306(a), 31 C.F.R. § 306.1(b))

---

6. Renobato maintains a *TREASURY DIRECT*® "Buy Direct®» Purchase Review," a "Buy Direct »
Confirmation," a *JNR* transaction request cover letter, and a Form 3905 contract, such as EHXIBITS- F & H,
for each of the 23 T-bill issues listed, all of which will be requested admitted into evidence in due course.

Instructions for the issuance and delivery of the new securities are to be signed by the owner, must accompany the securities presented, and are to be written on Form PD 3905 or Form PD 1827 as appropriate and shall be used. (31 C.F.R. § 306.15) Such Form 3905 (i.e. franchise contract) or Form 1827 are in fact the official documents prescribed by law for issuing transaction requests concerning the exchange, transfer, reissue, redemption exchange, repurchase, and/or payment of government securities in compliance with applicable laws. (FED.R.CIV.P. Rule 9(d)) In accord therewith, Plaintiff trusted federal regulation 31 C.F.R. § 306.15 and detrimentally relied on use of Form 3905 to instruct execution of the denominational exchange *STRIPS TRADES* accounted for in this case.

## CIVIL COMPLAINT
## COUNT I
### 31 C.F.R. § 309.3

**12. Broken Denominational Exchange Promises.** The transfer, exchange, reissue or other transaction requested in transferable registered securities is lawfully made in accordance with Subpart F of Part 306 in Title 31 Code of Federal Regulations. (31 C.F.R. Part 306) Transferable registered securities are eligible for denominational exchange at any time but must be received before the due date on which the securities mature. (31 C.F.R. §§ 306.15, 357.28, 357.29) As applied to this case, the listed T-bill issues identified in Treasury Series 912796 bearing mixed letter tail *CUSIPS*: HK8, GH6, GN3, GS2, GW3, JG5, JL4, JQ3, JU4, HU6, KA6, KD0, KG3, JE0, KP3, KQ1, KU2, LA5, LF4, LL1, LQ0, LU1, and LY3 each had a transaction request issued by *JNR* written on Form 3905 and same was received by BFS before the maturity date thereof as depicted in the following Table: (*See also* EXHIBITS- J1 & J2 *attached hereto.*)

---

[7.] "Fiscal service" is a service inside the Department of the Treasury. (31 U.S.C. § 306(a)) Fiscal services neglected by BFS/BPD are long overdue, regardless of the forward nature of the hybrid securities/commodities warrants. The terms "security" and "commodity" or their derivative forms are used interchangeably throughout this writing. (*See e.g. SEC v. W.J. Howey & Co.,* 328 U.S. 293 (1946))

**FORM 3905 Instructions [912796 Series]**

| T-bill Issue | *JNR* Dispatch | BFS/BPD Receipt | Redemption Payment Due Date |
|---|---|---|---|
| HK8 | 2/19/16 | 2/23/16 | 4/7/16 |
| GH6 | 3/14/16 | 3/17/16 | 4/26/16 |
| GN3 | 4/8/16 | 4/12/16 | 5/26/16 |
| GS2 | 5/5/16 | 5/10/16 | 6/23/16 |
| GW3 | 6/6/16 | 6/10/16 | 7/21/16 |
| JG5 | 7/7/16 | 7/15/16 | 8/25/16 |
| JL4 | 8/5/16 | 8/11/16 | 9/22/16 |
| JQ3 | 9/2/16 | 9/8/16 | 10/20/16 |
| JU4 | 10/1/16 | 10/7/16 | 11/17/16 |
| HU6 | 10/21/16 | 10/24/16 | 12/8/16 |
| KA6 | 11/12/16 | 11/16/16 | 12/29/16 |
| KD0 | 12/2/16 | 12/7/16 | 1/19/17 |
| KG3 | 12/23/16 | 12/30/16 | 2/9/17 |
| JE0 | 1/12/17 | 1/19/17 | 3/2/17 |
| KP3 | 2/2/17 | 2/6/17 | 3/23/17 |
| KQ1 | 2/17/17 | 2/21/17 | 4/6/17 |
| KU2 | 3/16/17 | 3/20/17 | 5/4/17 |
| LA5 | 4/13/17 | 4/17/17 | 6/1/17 |
| LF4 | 5/12/17 | 5/15/17 | 6/29/17 |
| LL1 | 6/9/17 | 6/12/17 | 7/27/17 |
| LQ0 | 7/7/17 | 7/10/17 | 8/24/17 |
| LU1 | 8/4/17 | 8/10/17 | 9/21/17 |
| LY3 | 9/5/17 | 9/8/17 | 10/19/17 |

As a result, upon receipt of Form 3905, since BFS had ample time to process and handle the transaction requests electronically in a situation where the customer sells a security through or to a securities intermediary, BFS did then and there break its promises to make denominational exchanges of Plaintiff's T-bills, and did so in the following fashion:

**a. Formation.** The way the contracts of purchase and contracts of sale were constructed is by writings for the sale of articles, financial instruments, or goods valued at $500 or more. (U.C.C. § 2-201) The purchase orders for the T-bill instruments are illustrated in what *TREASURY DIRECT*® refers to as a "Buy Direct® » Purchase Review" document, and a "Buy Direct » Confirmation" form (f.k.a. Form 5381), whereas the sell orders are statutorily required to be written on Form 3905 or Form 1827. (17 C.F.R. § 240.10b-10; 31 C.F.R. § 306.15) Evidence illustrating the "purchase" and "sale"

contracts surrounding issue 912796HK8 and the Treasury Auction Announcement and

detailed Treasury Auction Results for HK8 are contained herein, and same or similar sets

of such papers are maintained and are available for each of the 23 transaction requests

drawn on the identified bills. (*See* EXHIBITS- F1, F2, F3, & F4, *and compare* EXHIBITS-

G1, G2, & G3, *and see also* EXHIBITS- H1, H2, H3, & H4, *and compare* EXHIBITS- I1,

I2, & I3 *attached hereto*.) Confirmation of formation in the purchases and sales of the 90-

day T-bills is therefore undeniable, albeit such $1,000 bid and $1,000,000 ask amounts

are miniscule SOES in comparison to, for example, the $28,000,000,000 gross offering

amount for 912796HK8 T-bills due 7 April 2016.[8] (17 C.F.R. § 240.10b-10)

    **b. Performance.** The performance due from the Bureau in execution of the

contract of purchase is to register the title ownership, quantity, price, payment dates, and

serial numbers for the customer's account; whereas the performance due in execution of

the contract of sale is the entering of the market price, due date, serial number, and

payment terms respecting the completion of the transaction. (31 C.F.R. §§ 357.22,

357.28; 12 C.F.R. §§ 220.2, 220.6) Here, Respondent breached its performance due by

failing to follow the specific instructions for disposition of the securities contained on

Form 3905 in the clearance, settlement, and "completion of the transaction" of the

*TRADES* due 4/7/16 for  HK8, due 4/26/16 for GH6, due 5/26/16 for GN3, due 6/23/16

for GS2, due 7/21/16 for GW3, due 8/25/16 for JG5, due 9/22/16 for JL4, due 10/20/16

for JQ3, due 11/17/16 for JU4, due 12/8/16 for HU6, due 12/29/16 for KA6, due 1/19/17

for KD0, due 2/9/17 for KG3, due 3/2/17 for JE0, due 3/23/17 for KP3, due 4/6/17 for

---

[8.] As previously stated, these repurchase transactions are to be deemed: "purchases" and "sales" as defined in the Exchange Act; wherefore the terms "buy" and "purchase" each includes any contract to buy, purchase, or otherwise acquire, whereas the terms "sale" and "sell" each include any contract to sell or otherwise dispose of. (15 U.S.C. §§ 78c(13) 78c(14)) At this point, it should be noted that the difference between the 'bid' and 'ask' is known as the 'spread' in commodities/securities industry parlance.

Negligence is the failure to use such care as a reasonably prudent and careful person would have exercised under the same or similar circumstances, and is also conduct that falls below the standard established by law for the protection of others against unreasonable risk of harm. (*See e.g. Amoco Chemical Corp. v. Hill*, Del.Super., 318 A.2d 614; *and United States v. Ohio Barge Lines Inc.*, 607 F.2d 624) As such, Defendant's negligent clearance in the continuous net settlement (i.e. transfer and payment DVP/COD) of Treasury bills, notes, and bonds held in *TRADES* that is required to be easy (i.e. "EZ") per Treasury security regulations, is now broken down. (31 C.F.R. § 321; NYSE Rule133)

   **a. Duty.** Federal law establishes a national system for the clearance and settlement of securities transactions, whereas industry custom recognizes a clearing obligation in the relationship between public customer investor Plaintiff and government securities intermediary Defendant for the prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto. (15 U.S.C. § 78q-1 *et seq.*, *e.g.* NASD Rule 3230)

   **b. Standard of care.** The statutory "EZ Clear" standard of care for comparison, reconciliation, and settlement of contracts in government securities is solely in the hands of the Bureau of the Fiscal Service Division of Customer Service. (31 C.F.R. § 321.1)

   **c. Breach.** Respondent did not make, much less complete appropriate clearance, transfer, and redemption exchange of Plaintiff's T-bills easily (i.e. "EZ") as required by law to be efficient for reduction of risk, but instead hindered, interfered with, or obstructed making full settlement payments due as specified in Paragraph 12 above. (*See supra.*)

---

monitoring the issuance of such securities, registering the transfer of such securities, exchanging or converting such securities, and/or transferring record ownership of securities by bookkeeping entry without physical issuance of securities certificates. (*See e.g.* 58 Fed.Reg. 5587 at 5591 (January 22, 1993))

**d. Cause in fact.** Defendant's negligent processing of the T-bill transaction requests from the time such disposition instructions were received by Defendant, to when such redemption payments came due, directly links conduct in Defendant's facility to its failure to perform "EZ Clear" services as a clearing or transfer agent in the money supply chain, thereby causing capital gain profits to be lost, destroyed, or defaced from T-bills that were mutilated by Respondent's mishandling thereof. (*See* 31 C.F.R. Part 357 App. B(*J.*); NYSE R 223, *and Hayes v. Railroad Co.*, 111 U.S. 228, 4 S.Ct. 369, 28 L.Ed. 410)

**e. Proximate cause.** But for BFS's nonfeasance, misfeasance, or malfeasance in entering the appropriate number of zeros (i.e. "000") for Renobato's *TRADES* on the books of the Treasury (i.e. into the automated debt entry computer system), and its corresponding refusal to deal with arbitrage player Renobato's transaction requests legally submitted within variable price limits on Form 3905 is seen in its recording of erroneous market price data and entry of false contract of sale data on the *TRADES*- amounting to illegal passive market making and directly causing Plaintiff's economic injuries. (*See* 17 C.F.R. § 240-10b-6A, *and Ins. Co. v. Boon*, 95 U.S. 117, 24 L.Ed. 395)

**f. Damage.** The damages caused by Respondent's clearing nonfeasance, misfeasance, or malfeasance in transacting such 23 *STRIPS TRADES* instructions of Claimant has caused substantial pecuniary damages to Renobato without question.

## COUNT III
### 31 U.S.C. § 306, 31 C.F.R. Part 306, Part 309
**14. Fiscal Service Fraud.** To restate, fiscal service is a definite and certain service inside the Department of the Treasury. (31 U.S.C. § 306(a)) And again, the Bureau of the Fiscal Service is the governmental entity that is statutorily responsible for performing such "transactions after issue" (i.e. fiscal services) within the Treasury. (31 C.F.R. § 306.1(b))

61 L.Ed. 419) Furthermore, for defense to argue that the material economic terms are something other than the fact that the securities haircut (i.e. overlying option) required on a Treasury securities position held or carried for a dealer trading for his own account is $1,000 (established by law), or that the standardized contract size for 90-day Treasury bill instruments is not $1,000,000 (established by industry custom), that the cost of the underlying physical asset (i.e. dollar bills [regardless of denomination]) is 0.04¢ per unit (established by independent research), or that the transactional facts are not as put forward in Schedule D for 2016 and 2017 would be to deceitfully introduce economic falsehoods to this Court and can not be permitted. (*See* 17 C.F.R. § 240.15c3-1; 17 C.F.R. Part 402 *et seq.*; *and see* EXHIBITS- B, C, D, E, J1 & J2 *attached hereto*.)

    **c. Economic damages.** Therefore, the fungibility fraud and/or price reporting deceit perpetrated on part of the Bureau's Division of Customer Service is seen in its recording, registering, or reporting on contract of sale prices for Renobato that are not true and bona fide prices from Form 3905 instructions. The illegal acts of Bureau's misrepresentations occur when it enters erroneous market price data into the electronically linked money supply chain combining Treasury, Federal Reserve and open market participant Plaintiff's commercial deposit account thereby causing holder several economic injuries on the serialized T-bills. Constitutionally speaking, Plaintiff has the inalienable right to conduct his legitimate business for profit, under usual laws of supply and demand, without undue government interference. (*See Lafayette Dramatic Productions v. Ferentz*, 9 N.W.2d 57, 305 Mich. 193, *Holder v. Maaco Enterprises*, 644 F.2d 310 (4th Cir.1981), *Clearview Concrete Products v. S. Charles Gherardi Inc.*, 453

N.Y.S.2d 750 (App.Div.1982), *and College Aux. Servs. of State Univ. College at Plattsburg Inc. v. Slater Corp.*, 456 N.Y.S.2d 512, (App.Div. 1982))

## COUNT IV
### 7 U.S.C. § 6a

**15. Excessive Speculation.** The cited Commodity Exchange regulation was enacted by the legislature in order to prevent economic evils of manipulated, controlled, cornered, or squeezed markets (i.e. "excessive speculation"), where a national public interest in interstate commerce trading of commodities (i.e. securities) as carried on by businesses engaged in the buying and selling thereof, is present. (7 U.S.C. § 5) According thereto, the Bureau's placing of limits on the market prices of trades, on the on the amounts of trading volume which may be done, or on the amount of net long positions which may be held by any person is wrong unless it comports with Treasury regulations. (31 C.F.R. §§ 356.13, 357.22) More particularly, forcing creditor Claimant as a public investor, after the acquisitions of HK8 on 1/4/16, GH6 on 1/25/16, GN3 on 2/22/16, GS2 on 3/21/16, GW3 on 4/18/16, JG5 on 5/23/16, JL4 on 6/20/16, JQ3 on 7/18/16, JU4 on 8/15/16, HU6 on 9/6/16, KA6 on 9/29/16, KD0 on 10/17/16, KG3 on 11/7/16, JE0 on 11/28/16, KP3 on 12/19/16, KQ1 on 1/3/17, KU2 on 1/30/17, LA5 on 2/27/17, LF4 on 3/27/16, LL1 on 4/24/17, LQ0 on 5/22/17, LU1 on 6/19/17, and LY3 on 7/17/17 to enter speculative naked long positions in government security bills backed by the full faith and credit of the United States, and use a hold 'til maturity trading strategy in the relevant Treasury issues, has caused sudden and/or unreasonable market fluctuations in the standardized $1,000,000 contract size for 90-day T-bills, and baseless changes in the market price of such security to the detriment of the market participant trader, and in doing so has put an undue burden on interstate commerce, and has imposed unnecessary costs on investor. (7

U.S.C. § 6a(a)) Therefore, this regulation is applied in order to protect commerce by facilitating the transfer (i.e. movement) of Renobato's T-bill arbitrage in interstate commerce as a means of commercial risk reduction against possible loss through unwarranted fluctuations in prices. (*See* 31 C.F.R. § 357.22, 31 C.F.R. Part 321 Subpart D, *and e.g. CFTC Staff Study*, COMM.FUT.L.REP., 1975-1977 CCH Dec. ¶20,027) With the aforementioned restriction of the sales (i.e. repurchase) price to $1,000 par value, and imposing production limits on the availability and/or cost of underlying dollar bill by-products, BFS has perpetrated the technical act of price fixing *per se*. (*See* Joyce, *Effect of Firm Organization Structure on Incentive to Engage in Price Fixing*, 7 Contemp. Policy Issues 19 (1989) (importance of auction markets as facilitating collusion)) The truth is that individual Renobato; (1) has not exceeded position limits by carrying no more than $4,000 in net long haircuts at any one time- covering 25,000 units of underlying bill assets per haircut, and generating anywhere from $25,000 to $2,500,000 in variable unit pricing production per cut depending on denomination, (2) has not exceeded the $1,000,000 position limit enacted by the industry's standardized contract size for 13-week T-bills or on the face of the Form 3905 contract itself, and (3) has legal right to exercise exchange choices through unsolicited arbitrage *TRADES* to make capital gains and as creditor thereon does not have to be forced to accept unlimited risk of loss by not incorporating exercise of exchange options into trading activities. (*See* 17 C.F.R. § 240.10a-2, 31 U.S.C. § 3101, 31 C.F.R. 315.10, *Nobleman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1995), *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), *and e.g.* NYSE Rule 116 Stop Constitutes Guarantee, NYSE 235 Ex-Rights) Thus, by forcing Claimant to face

pure naked long speculation (buying a security with hope that price increases) without use of options (i.e. rights) exercised on the 90-day T-bill *TRADES* (that is to say limiting Claimant to hold 'til maturity at same $1,000 strike price and forego participation in the variable strike price exchange offer afforded under regulation statements in CFR), BFS has violated the prohibition on excessive speculation under United States Code. (*See Rivers v. Rosenthal & Co.*, 634 F.2d 774 (CA 5(Ga.)1980), *Moody v. Bache & Co. Inc.*, 570 F.2d 523 (5th Cir.1978), *and Citizens United v. Federal Election Committee*, 558 U.S. 50 (2010) ["limiting money is like limiting speech"])

## COUNT V
### 7 U.S.C. § 6c(a)

**16. Forced Wash Sales.** United States Code expressly prohibits and makes it unlawful for any person to offer to enter into, or to confirm the execution of, any transaction involving any commodity which is of the character of a meretricious transactions, or is commonly known to the trade as a "wash sale," or which may be used for determining the price basis of any such transaction in interstate commerce, in any commodity or the products or by-products thereof, or  to deliver such commodity sold, shipped, or received in interstate commerce for the fulfillment of; (1) a "wash sale" or "fictitious sale," or (2) causing a price to be reported, registered, or recorded which is not a true and ***bona fide*** price. (7 U.S.C. § 6c(a)) In this case, Plaintiff placed stop loss orders using Form 3905 in the spot cash market for bills manufactured by the Treasury on the business days or transaction dates listed in Paragraph 12 above. (R.) Even so, Defendant has knowingly or willfully deceived or attempted to deceive Plaintiff by any means whatsoever in regard to the orders, contracts, or instructions on Form 3905 for the disposition or execution of such orders or contracts, by placing said sell orders in the same product and expiration

month, for the put or call option, at the exact same strike price, with complete disregard to its acts of agency or fiduciary performed with respect to such contract orders of Claimant. (*See Perdue v. Crocker Nat. Bank*, 39 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503 (1985)) In failing to carry out the specific instructions for the identified T-bills at the $1,000,000 strike price; Defendant has illegally made, caused to be made, or accommodated the false reporting or statements of positions, physical deliveries, and/or capital gains of Plaintiff by direct or indirect means. (7 U.S.C. § 6b; 17 C.F.R. § 240.11Ac1-3; CME Rule 534) The liability of principal BFS/BPD for the acts, or conduct of employees, agents, or representatives is determinable. (7 U.S.C. § 4)

## COUNT VI
### 7 U.S.C. § 13b, 15 U.S.C. §§ 78i, 78j, 17 C.F.R. § 240.10b-1

**17. Market Manipulation.** The offense of Respondent in manipulating, attempting to manipulate, or having manipulated the market price of 90-day T-bills, in interstate commerce, for future delivery was committed by causing market prices to artificially go up or down, by means directed to end or prevent prices from going up or down. (*See General Foods Corp.*, 6 A.D. 288, (1947), rev'd sub. nom. *General Foods Corp. v. Brannan*, (CA 7), 170 F.2d 220) As such, the fictitious $1,000 sideways market prices reported by Bureau on the Redemption Payment Due Dates shown in the Table in Paragraph 12, is clearly deceptive because it does not represent the true instructions for the disposition of the bills thereby exercising discretionary power in such customer's account where the customer has not given prior written authorization to run the *TRADES* at any price other than instructed on Form 3905. (R.) By publishing or circulating any communication which reports the transactions as a "purchase" or "sale" of the security at a quoted bid price or ask price that does not represent the actual bona fide bid price or ask

price of such security, BFS has attempted to manipulate, or has manipulated the market price of such bills, and has cornered, or attempt to corner the T-bill products or by-products flowing therefrom by knowingly or purposely delivering false, misleading, or inaccurate crop or market reports or conditions that affect price and such conduct is also illegal *per se*. (TX.D.P.A.) Therefore, if the purpose of the markets is to provide a continuous flow of competitively determined prices, for the purpose of guiding the allocation of resources and facilitating the production, processing, and merchandising of T-bills by investors, then this Court must preserve the functions of price discovery and risk reduction by implementing damage recovery for Claimant Renobato in this case.

## COUNT VII
### 15 U.S.C. § 1

**18. Restraint of Trade.** In the open market system of the United States, since on or about August 2017, said owner has unlawfully been locked out of *TREASURY DIRECT*® online account access by Defendant thereby preventing and/or disabling participation in weekly government auctions wherein such T-bills are marketed, sold, and placed in the hands of the investing public. (*See* EXHIBITS- M1 & M2 *attached hereto*.) The chilling effect of this practice instituted by Respondent is state action that expressly causes the restraint of the M1 money supply on bank demand deposits (*See U.S. v. Aluminum Co. of America*, 148 F.2d 416 (2nd Cir. 1945)) Conspicuously, the Sherman Act forbids any sort of combination in restraint of trade instituted for the purpose of eliminating competition by fixing prices and/or limiting production as has been done here by Respondent.

    **a. Vertical refusal to deal.** Defendant has taken a free ride on Plaintiffs *TREASURY DIRECT*® Account R-192-092-757 in 2016 and 2017 by refusing to facilitate a public offering (i.e. holding up Plaintiff's Form 3905 trade instructions while continuing to

accept, process, and handle other participant's transaction requests) in the vertical

Treasury<br>
|<br>
Federal Reserve<br>
|<br>
Bank<br>
|<br>
Participant

T-bill distribution and supply chain. (*See* 31 C.F.R. Part 357 App. B(*J.*), *and e.g. Town of*

*Concord v. Boston Edison Co.*, 915 F.2d 17 (1st Cir.1990), cert. denied, 499 U.S. 931,

111 S.Ct. 1337 (1991)) Clearly, BFS controlling 100% of the *TREASURY DIRECT* ready

market has an obligation to make a bona fide public distribution at the public offering

price of securities of a public offering, which trade at a premium in the secondary market

whenever such secondary market begins (a "hot issue"), when there is a demand for an

issue as consistent with high standards of commercial honor and just and equitable

principles of trade, whereas the failure to do so leads to an impairment of public

confidence in the government securities business (*e.g.* NASD Rule IM-2110-1) thereby

undermining the honor of the full faith and credit of the United States backing the value

of the bills. (*See Rooney v. Inheritance Comm'n of Kansas*, 143 Kan. 143, 53 P.2d 500

**b. Price and/or supply squeeze.** By forcing Claimant to accept sale prices at the

same (i.e. identical) strike price as the corresponding purchases were made, Defendant

has squeezed Plaintiff and is attempting to eliminate Renobato from participation in the

money supply chain altogether. (*See Bonjorno v. Kaiser Aluminum & Chemical Co.*, 752

F.2d 802 (3rd Cir. 1984), cert. denied, 106 S.Ct. 3284 (1986) [price squeeze used to drive

revenues down disabling ability to earn a profit].) Because Respondent's desire to charge

independent *JNR* higher prices for the underlying T-bill asset by product than its own

dealers (i.e. Fed) it has destroyed its intrinsic value, as well as the bills exchange feature,

and threatens to cause injury to all consumers who hold bills- in the form of higher prices and diminished purchasing power. In doing so, Respondent has squeezed Plaintiff through inefficiencies in processing, handling, and fulfillment of transaction requests and has instituted barriers to entry attempting to deter and prevent Washington D.C. outsider Renobato from coming into the market for government securities. (*See United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), affirmed per curiam, 347 U.S. 521, 74 S.Ct. 699 (1954)) Such restraint is illegal not only because it is injurious to the public, but also because it; (1) deprives the public of the enterprise and talent of individuals, (2) prevents, excludes, or eliminates competition from the market, and (3) fosters monopoly in the market for monetary production because Defendant controls all the facilities, electronics, equipment, means, resources, and mechanisms of production used in execution of government securities transaction requests and fiscal services. (*See* 7 U.S.C. § 9, *and U.S. v Electronic Payments Svc's Inc.*, No.94-208 (D.Del. Apr. 21, 1994))

## COUNT VIII
### 15 U.S.C. § 2

**19. Monopolizing Trade.** By law, the investing public has a statutory right to subscribe to the capital stock of the United States, however, the Bureau of the Fiscal Service has demonstrated its dominance and market power in the relevant market not only by controlling prices but also by excluding competition. (12 U.S.C. § 283; 15 U.S.C. § 2)

  **a. Dominant firm.** Although Bureau of the Fiscal Service controls the *TREASURY DIRECT*® gateway portal and is the dominant firm offering Treasury securities, there are other government securities brokers that sell Treasuries, but 100% of those secondary sales must eventually go through the *TREASURY DIRECT*® system of the Bureau for confirmation, execution, and completion of the transaction. In fact, Defendant, because of

its intermediary position between Treasury and Federal Reserve is able to keep others out of the field and is considered to be a monopoly here because in its "Access Your Account » Account Number" page Plaintiff now receives the following threatening message: "TreasuryDirect is unavailable. The following error(s) have occurred: For security reasons, your account cannot be accessed. Please contact us at (844)284-2676." (*See* EXHIBITS- M1 & M2 *attached hereto*.) Plaintiff called and was connected to a BFS/BPD employee who would not give their name, refused to consider the facts of Form 3905, and offered no alternative choices, thereby instigating this lawsuit. (R.)

**b. Market power.** BFS/BPD has repeatedly demonstrated its power to reduce output (by restricting execution of transaction request), and charge more than a competitive price for its product(s) (by not providing fiscal services), or stated differently, Defendant has shown its power to control market prices for Claimant's T-bills and exclude Claimant from competition in that marketplace. (*See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994 (1956)) The willful maintenance of that sort of power here by BFS/BPD as distinguished from improving economic growth or expanding monetary development is a consequence of historic accident (*See U.S. v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698 (1966)) Obviously Bureau's acquisition of market power in this case is not derived from a superior product, or from business acumen, but rather by happenstance in the governmental structure of necessity in facilitating the money supply. (R.) Notwithstanding however, and commensurate with Treasury Auction Reforms included in Pub. L. 103-202, title II, § 202, Dec. 17, 1993, 107 Stat. 2356, statute provides: (a) for the ability to Submit Computer Tenders in Treasury Auctions, and also for (b) Prohibition on Favored Players-

where in general- no government securities broker or government securities dealer may receive any advantage, favorable treatment, or other benefit in connection with the purchase upon issuance of securities issued by the Secretary of the Treasury. Consequently fiscal agent BFS is violating customer protection mandates by eliminating the ability of Plaintiff to access or participate in public Treasury Auctions, and is interfering with the redemption exchange of such T-bill articles acquired, tendered, and redeemed while allowing other participants to do so. (*See In re Missner* (SEC 1996), FED.SEC. L.REP. CCH ¶74,306 [SEC Held: Treasury linked swaption is held a cash-settled put option on the spread between the price yield of two Treasury securities], *but see Trustman v. Merrill Lynch Pierce Fenner & Smith Inc.*, (C.D.Cal. Jan. 24 1985), COMM.FUT.L.REP. 1984-1986, CCH Dec. ¶22,490 [T-bond futures trading in customer's account were subject to CFTC authority].) Respondent's position as the dominant firm (i.e. monopolist) in the market for T-bills coupled with its vertical refusal to deal (i.e. supply) is therefore against the law. (*See Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.ed.2d 265 (1992))

     **c. Monopoly power.** Because Bureau of the Public Debt can control access to the government auctions in its *TREASURY DIRECT*® ready market and also control repurchase prices on Form 3905 in the relevant market for 90-day T-bills, it has a dangerous probability of monopolizing such trade. In fact Defendant's dominant market power is so great, it is sufficient to abscond with the gross means and resources of production (i.e. investment funds) with regards to the last three 90-day T-bills Renobato purchased, to wit; issue LQ1 on 5/22/17, issue LU1 on 6/19/17, and issue LY3 on 7/17/17, as if such acquisitions never occurred, don't exist, or were hypothetical. (*See* EXHIBITS N1, N2 &

N3 *attached hereto*.) On these overt illegal acts of BFS/BPD, counsel for defense is challenged to prove repayments of those issues due on 8/24/17 for LQ0, due on 9/21/17 for LU1, and due 10/19/17 for LY3 to show Respondent is not a flat out thief. (M.P.C. Art. 223) Thus, Defendant's conduct here must be scrutinized to balance its 100% market share of the *TREASURY DIRECT* platform for T-bills (90-day[13 week], 180 day [26 week], and 360 day [52 week] varieties) for operational efficiency and payment integrity.

## COUNT IX
### 15 U.S.C. § 13

**20. Discrimination in Price, Services, or Facilities.** The maturity redemption face value price fixing committed by Bureau in its attempting to control prices is illegal *per se* under the Robinson-Patman Act and is also contrary to public policy since physical T-bill byproducts are a necessary commodity (i.e. security) to the American public. (31 C.F.R. § 309.6) Because Defendant is engaged in interstate commerce crossing state lines of Texas and District of Columbia and other States, and has "cornered the market" so to speak- in its omission to follow the administrative procedures called for in respect of handling and processing of reverse repurchase agreements of government securities, the dominant single firm Bureau has illegally attempted to raise prices and restrict output of Treasury bills. (31 U.S.C. §§ 3121(c), 3333(b)) In other words, Respondent is guilty of fixing the exchange redemption payments in a freely floating spot market by discretionarily selecting the face value for *corpus* components in short swing trades in contrivance of Claimant's instructions for the position upon maturity as described herein and before. (*See e.g. United States v. Terminal R.R. Ass'n*, 224 U.S. 383 (1912))

    **a. Secondary line price discrimination.** By executing sales or repurchases of Renobato's T-bills at prices different than requested on Form 3905 Defendant has

demonstrated a discriminatory pricing policy as between the instant *TREASURY DIRECT*® customer in the original issue T-bill market and other bidders for such T-bill products or by-products. The Defendant's unjustified conduct in favoring purchasers that produce a lower rate of return, or who do not make any transaction requests whatsoever, put Plaintiff (a SOES player in the weekly billion dollar market for 90-day T-bills) at a competitive disadvantage, has cost Plaintiff business (i.e. lost profit margins), and does not permit any consumer choice. Defendant's lower[sic] (i.e. from top to bottom on contract Form 3905) priced sales or repurchases to any of Defendant's established customers yields imperfect competition through its price fixing and must be corrected. (*See e.g. J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923 (1981), on remand, 670 F.2d 575 (5th Cir.), rehearing denied, 677 F.2d. 117 (11th Cir.), cert. denied, 459 U.S. 908, 103 S.Ct. 212 (1982), *J.F. Feeser Inc. v. Serv-A-portion Inc.*, 909 F.2d 1524 (3rd Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313 (1991), *Edward J. Sweeney & Sons Inc. v. Texaco Inc.*, 637 F.2d 105 (3rd Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981 (1981), *and U.S. v. Philadelphia Nat. Bank*, 374 U.S. 321 (1963))

   **b. Essential facility.** As a general matter a firm is best off when it serves every customer able to pay. (*See e.g. Weiss v. York Hosp.*, 745 F.2d 786 (3rd Cir.1984), cert. denied, 470 U.S. 1060, 105 S.Ct. 1777 (1985)) Here, Respondent is a single firm that controls the facility consisting of network structure[11] giving access to the T-bill IPO

---

[11.] Admittedly, Defendant's website reads:
"You are accessing a U.S. Government information system (which includes computers, computer networks, and all devices and storage media attached to a Treasury network or to a computer on such network) that is provided for U.S. Government-authorized use only. By using this system, you understand and consent that there is no reasonable expectation of privacy regarding any communications or information transiting, stored on, or traveling to or from this system. The government routinely monitors and may, for any lawful government purpose, intercept, search, and seize any communication or information transiting, stored on, or traveling to or from this information system and such information may be disclosed or used for any lawful government purpose." (*See* www.treasurydirect.gov)

market. Because it is owned by the government, BFS/BPD qualifies as an essential

facility because it actually defines and makes up the relevant market. Its unreasonable

refusal to share the ability to make denominational exchanges is conduct that has resulted

in anti-competitive effects on pecuniary imput that is crucial to production of secondary

bill products stimulating the national economy, and is exclusionary to independent

individual participants. (*See e.g. Hecht v. Pro-Football*, 570 F.2d 982 (D.C.Cir.1977),

cert. denied, 436 U.S. 956, 98 S.Ct. 3069 (1978), *United States v. AT&T*, 552 F.Supp. 131

(D.D.C.1982), affirmed mem. sub nom. *Maryland v. United States*, 460 U.S. 1001, 103

S.Ct. 1240 (1983); *United States v. AT&T*, 524 F.Supp 1336 (D.D.C.1981), *and Otter

Tail Power v. United States*, 410 U.S. 366, 93 S.Ct. 1022, rehearing denied, 411 U.S.

910, 93 S.Ct. 1523 (1973)) Leaving Defendant's dispayed predatory practices unchecked

threatens higher prices, reduces output of bills, destroys purchasing power of the bills,

and threatens to perpetuate monopoly power already held by Defendant and will only

serve to politicize access to open markets and stifle free trade. (*See also Flip Side

Productions  Inc. v. Jam Productions Ltd.*, 843 F.2d 1024 (7th Cir.), cert. denied, 488 U.S.

909, 109 S.Ct. 261 (1988), General Accounting Office, *Payments Clearance and

Settlement: A Guide to the Systems, Risks, and Issues*, GAO/GGD-97-73 (June 1997))

    **c. Restricted bill output.** Because Defendant has restricted the output of T-bill

products or by-products of like grade and quality at a rate insufficient to meet the public

demand or to settle *TRADES* it has discriminated in the facilities and services of fiscal

production and bill manufacture. At play, are substantial economies of scale- increasing

price per unit costs of underlying physical bill assets and overlying bill option output

decreases, in addition to marginal cost differences between hard money (i.e. physical

bills) and soft money (i.e. electronic funds transfers) payment options that can be freely initiated at different prices provides the security features recognized and appreciated by consumers. (*See AA Poultry Farms v. Rose Acre Farms*, 881 F.2d 1396, (7th Cir.1989), cert. denied, 494 U.S. 1019, 110 S.Ct. 1326 (1990), *American Column & Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114 (1921), *Klor's Inc. v. Broadway-Hale Stores Inc.*, 359 U.S. 207, 79 S.Ct. 705 (1959), *Appalachian Coals Inc. v. United States*, 288 U.S. 344, 53 S.Ct. 471 (1933), *Almeda Mall v. Houston Light & Power Co.*, 615 F.2d 343 (5th Cir.1980), *and United States v. Reading Co.*, 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760)

## COUNT X
## 18 U.S.C. Ch. 31, M.P.C. Art. 223 *et seq.*

**21. False Pretenses.** In its significant involvement as a securities intermediary in the domestic money supply chain, Defendant has authorized the unreasonable taking of 3 of Plaintiff's 90-day T-bills, or has unlawfully exercised control over, moveable property of Plaintiff with the purpose to deprive Plaintiff thereof. (*See* U.S. CONST. amend. V, amend. XIV § 1, M.P.C. Art. 223.8, *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), *Bergman v. People*, 177 Ill. 244, 52 N.E. 363 (1898), *Rex v. Sullens*, 168 Eng. Rep. 1212 (Cr.Cas.Res.1826), *Ennis v. State*, 13 Okla.Crim. 675, 167 P. 229 (1917), *State v. Harrison*, 347 Mo. 1230, 152 S.W.2d 161 (1941), *and State v. Comer*, 176 Wash. 257, 28 P.2d 1027 (1934))

    **a. Claimant's property.** The personal property in this count refers to Plaintiffs 90-day T-bills made or being made under contract with the United States as identified by *CUSIP* 912796LQ0 acquired 5/22/17, 912796LU1 acquired 6/19/17, and 912796LY3 acquired 7/17/17. (*See* EXHIBITS N1, N2, & N3 *attached hereto.*) Such 90-day T-bill properties have title registered to Renobato individually. (Restatement, Second, Trusts § 2)

**b. Government custodian.** Bureau of the Fiscal Service is the securities intermediary inside the Department of the Treasury entrusted with safekeeping, possession, and fiduciary control of Plaintiff's financial bill instruments LQ0, LU1, and LY3 acquired through its *TREASURY DIRECT®* website, and purposely went on to steal such property (valued at more than $500 each) upon repurchase agreement Redemption Payment Due Dates 8/24/17, 9/21/17, 10/19/17, while being subject to known legal obligations to make specified payment or other disposition thereof. (*See* M.P.C. § 223.1(2)(a), *and* EXHIBITS O1, O2, & O3 *attached hereto*.)

**c. Required disposition.** The highest value, by the reasonable commodity industry standardized $1,000,000 contract size strike price, of the LQ0, LU1, and LY3 T-bills that were also requested denominationally exchanged using Form 3905 totals $3,000,000 in aggregate. (M.P.C. § 223.1(2)(c); 31 C.F.R. §§ 306.15, 309.3)

**d. Permanent deprivation.** Because BFS has knowingly, purposely, recklessly, or negligently failed to make any payment (i.e. repurchase) whatsoever, much less disposition (i.e. sale) of T-bills 912796LQ0 due 8/24/17, 912796LU1 due 9/21/17, and 912796LY3 due 10/19/17, it has permanently deprived Plaintiff of such identified property then and there, and in doing so did then and there falsify accounting records and make false statements in the process. (18 U.S.C. § 1001) As such, Defendant has not only defaulted on paying the part redemption price of the bills, but has also concealed accounting for actual disposition of said T-bills upon lawful demand. (*See Hoovel v. State*, 125 Tex.Cr.R. 545, 69 S.W.2d 104, *Werner v. Southern Cal. Associated Newspapers*, Cal.App., 206 P.2d 952, *Remm v. Landrieu*, D.C.La., 418 F.Supp. 542, *and see* EXHIBITS- P1 & P2 *attached hereto*.)

# DAMAGES

**22. Add Derivative Shareholder Application for Lost Profits.** Because of the unlawful

acts committed by Respondent described herein, Plaintiff has suffered direct economic

injuries and property damage, not to mention the irreparable injury Respondent has

caused to the free trade and open market economic system of the United States of

America through its dishonorable conduct. (R.) Whether the damage in this section is

construed to be lost profits, or stolen, destroyed, mutilated, or defaced Treasury

obligations, the instant stakeholder in U.S. Treasuries has the legal right to proceed either

directly under antitrust laws, or indirectly as Plaintiff held capital stock of the United

States at the time of the transactions of which Plaintiff complains of, and has made efforts

to obtain the action prosecution desires by filing Form 1025 Claim report for 2016 *TRADES*

with officials at Bureau of the Fiscal Service in May 2017. (*See e.g.* FED.R. CIV.P. Rule

23.1, EXHIBITS P1 & P2 *attached, see also Procter & Gamble Co. v. Bankers Trust Co.*

(SD Ohio 1996), FED.SEC.L.REP. 1996-1997, CCH Dec. ¶99,229, *and Storey Parchment*

*Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed 544)

**23. Actual Money Damages.** A private right of action for actual money damages, and

assessment of money penalties are available at law and sought hereby. (*See* 7 U.S.C. §§

9, 25, *and see also Ingram v. J. Ray McDermott & Co. Inc.*, 698 F.2d 1295 (5th Cir.)) In

this particular instance, the actual amount of money damages resulting from transacting

23 duly requested denominational exchange *STRIPS TRADES* instructions on Form 3905

at the standardized $1,000,000 contract size is $22,977,000 in total or $999,000 per

transaction. (*See* EXHIBITS- J1 & J2 *attached*.) Punitive damages are also mathematically

ascertainable. (*See* 15 U.S.C. § 15, and Harrison, *The Lost Profits Measure of Damages*

*in Price Enhancement Cases*, 64 Minn.L.Rev. 751 (1980))

**24. Opportunity Cost.** Given that the government Treasury auctions are conducted on a weekly schedule, it is commercially possible and entirely plausible that Claimant could have increased the frequency of purchasing 90-day Treasury bills to coincide therewith, and would have participated in 52 auctions, and transacted 52 *STRIPS TRADES* of the sort illustrated herein, and over a two-year time period execute 104 trades. With the profit maximizing $1,000,000 valuation or pricing model for the 90-day T-bill issues presented by beneficial owner Renobato as applied to foreseeable futures using a weekly settlement cycle Plaintiff would gain over $250,000,000 in a five year period. Consequently, prosecution will request an expected $1,000,000,000 amount in gross damages paid in the form of a zero cost electronic funds transfer ('EFT') or marginal cost exchange of futures for physicals ('EFP') in redressing commercial injury stemming from the deadweight loss caused by the illegal trade restriction of the Bureau's market power monopoly in the 90-day T-bill trade routed through *TREASURY DIRECT*® ready market. As if paying down that part of the debt owed to U.S. citizens is somehow detrimental to the national economy, which of course it is not. Accordingly, for the purpose of the antitrust laws to increase consumer choice, lower prices, and assist competition, and also for the reasons cited above, Plaintiff **DEMANDS** Judgment for affirmative legal relief forthwith. (*See Doctor's Hosp. of Jefferson Inc. v. Southeast Medical Alliance Inc.*, 123 F.3d 301 (5th Cir. 1997))

## CONCLUSION

**25. Malfeasant Recidivist Monopolist Actor.** Having shown Defendant's; (1) violation of the antitrust laws, (2) cognizable injury attributed to such violations, and (3) at least an approximate amount of damages, the only conclusion to draw from the applicable law,

documented facts, and physical evidence is that Bureau of the Fiscal Service appears unable to abide by high standards of commercial honor and just and equitable principles of trade by neglecting its fiscal duties and failing to execute transactions after issue, but rather has succumb to illicit partisan desires to retaliate against Claimant by illegally preventing participation in the relevant market and has resorted to criminal conduct in peculating the means and resource of production from Plaintiff. (*See e.g. Malcom v. Marathon Oil Co.*, 642 F.2d 845 (5th Cir.1981), *Anago Inc. v. Tecnol Medical Products Inc.*, 976 F.2d 248 (5th Cir.1992), *and St. Bernard General Hospital Inc v. Hospital Service Association of New Orleans Inc.*, 712 F.2d 978 (5th Cir. 1983)) As such this court must act decisively against escheating scofflaw Respondent Bureau of the Fiscal Service.

## PRAYER

**26. Positive Derivative Case Valuation.** WHEREFORE AND FOR THE FOREGOING reasons Plaintiff prays for relief in the form of an ORDER executed in favor of Plaintiff GRANTING Claimant's supplication for capital relief as afforded under applicable laws (7 U.S.C. § 25; 15 U.S.C. § 15(a); 31 U.S.C. § 3125), by enforcing due payment of obligations and interest on the public debt (31 U.S.C. § 3123), as viable remedies (31 C.F.R. § 356.34) for Bureau of the Fiscal Service breaking the federal antitrust laws. (*See Cohen v. De La Cruz*, 523 U.S. 213 (1998), *and Texas Indus. V. Radcliff Materials Inc.*, 451 U.S. 630 (1981)) In effecting such ORDER the Court is addressing Defendant's irreparable injury to competition by preserving elemental market functions of price discovery and risk reduction, while upholding the sanctity of contracts, protecting customer funds, balances and securities, (17 C.F.R. § 149.15c3-3, 17 C.F.R. Part 403), protecting free enterprise, and resisting any improper political influence to retaliate

against such eyewitness for capitalizing and participating in the monetary supply system

of the United States of America.

SIGNED AND DATED this 27<u>th</u> day of <u>December</u> <u>2017</u>.

Respectfully submitted,
*JNRenobato*

By: _____

*JNR*

RENOBATO *&* ASSOCIATES
Jay Nolan Renobato, Arbitrageur *pro se*
PO Box 9771
The Woodlands, Texas. 77387
(213)364-8250